# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff/Respondent,

v.                                             No. CIV 03-1053 JP/LFG
                                                  CR 01-1312 JP

JEFFREY TODD VINER,

        Defendant/Movant.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1. On September 11, 2003, movant Jeffrey Todd Viner ("Viner") filed this *pro se* Motion to Vacate, Set Aside or Correct Sentence, under 28 U.S.C. § 2255. [Doc. 1.] Viner's motion and subsequent pleadings, some of which have been re-characterized as supplements[2] to his original

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] In deciding this matter, the Court has considered arguments and claims raised by Viner in his original § 2255 petition, Motion for Short Dismissal Rehearing [doc. 6], Larry Profit's Affidavit [doc. 14], Motion for Conpression [sic] Hearing [doc. 19], Motion for Short Rehearing [doc. 18], Motion for Proper Cause of Relief [doc. 16], Motion for Relief of Sentence [doc. 17], and Motion for Short Rehearing or in the Atenation (sic): Motion to Unseal all Documents [doc. 20], along with all attachments to these pleadings. There is also a Motion for Withholding Evidence to be Heard, filed apparently by Larry Profit (who has filed a number of affidavits in support of Viner's position) that was submitted to the Court on January 28, 2004. This "motion" was placed in the correspondence section of the criminal case, and was also reviewed by the Court in reaching its decision here. In addition, the court considered a letter from Viner, dated February 24, 2004 [Doc. No. 23], which was characterized by the Court as Motion for Hearing, and another affidavit from Larry Profit, filed February 15, 2004. [Doc. No. 22.]

§ 2255 petition, are not entirely clear as to the arguments he raises.  However, it appears that Viner claims that additional laboratory testing should have been performed on the cocaine seized in this case because of Viner's contention that the lab report was deficient and incomplete.  A somewhat related claim is Viner's contention that he was sentenced under enhanced guidelines relating to possession of crack cocaine rather than powder cocaine.  Viner's third claim is that there was an error in the Presentence Report ("PSR") that resulted in a longer sentence of incarceration. Viner also brings an ineffective assistance of counsel claim with respect to all of the above issues.  In other words, he argues generally that his attorneys failed to object to the lab report, failed to ensure that Viner was sentenced for crimes relating to powder cocaine rather than crack cocaine, failed to ensure that his criminal history points were calculated properly, and failed to properly investigate the underlying charges against him.  Viner also claims that counsel was ineffective for failure to file an appeal, and that all four of his attorneys were generally ineffective.  Finally, Viner continually requests a hearing or trial so that new evidence can be introduced that he believes would tend to exonerate him from the conspiracy charge to which he pled guilty.  [Doc. 1.]

   2. On December 4, 2003, the United States filed its response to Viner's § 2255 petition, arguing that Viner presents no meritorious claims and is not entitled to a hearing.  [Doc. No. 13.] Viner did not characterize any subsequent pleadings as a "reply" to the Government's response, although he did file a number of additional pleadings that the Court considered, as set forth in footnote 2.

   3. On June 22, 2001, Viner approached a checkpoint located North of Oro Grande, New Mexico.  He was driving a 1995 black Mercury Cougar and his co-defendant George Edward Harris was in the passenger seat. [Investigative report, attached to § 2255 petition, at p. 40.]  Viner is

African American and was about 19 years old at that time. Hall is Caucasian and was about 25 then. Senior Border Patrol Agent Jeff Holland asked both Viner and Harris a number of routine questions regarding their origin and destination. Eventually, Agent Holland asked Viner for consent to have a canine search the vehicle, and Viner agreed. At the secondary inspection area, a Border Patrol canine alerted positively to the passenger side floorboard of the vehicle. The inspection revealed a non-factory, fabricated compartment installed into the floorboard of the vehicle, in which 22 cellophane wrapped packages containing a white powdery substance were discovered. The gross weight of the packages was 52.94 pounds, and the substance field-tested positive for cocaine. [Investigative report, p. 40.]

      4.      Harris was advised of his Miranda rights by a special agent, waived his rights and was interviewed. Harris stated that he was hired to transport the cocaine to Lubbock, Texas by Adam Benjamin Porras, who lived in Mexico. According to Harris, he and Viner picked up the vehicle in El Paso and took the car to the Cielo Vista Mall where they met Joe (last name unknown), a man who was working for Porras. Joe took the vehicle for one hour and returned it to Harris and Viner after about one hour. Harris stated that he and Viner then received the instructions from Joe where to deliver the car in Lubbock. Harris instructed Viner to drive through the border patrol checkpoint because Harris stated that his license was suspended while Viner's was valid. Harris provided additional details to the agent regarding how and where the delivery in Lubbock was to be made. Harris explained that eventually Joe was to be paid $100,000 and that Harris, Viner and Joe were to travel to Mexico and give Porras the $100,000. Porras was to pay Harris $6000, and Harris intended to split the money with Viner. Harris agreed to deliver the vehicle to Lubbock as planned and to assist the government with a controlled delivery of the cocaine.

5. Viner was also advised of his Miranda Rights, waived the rights and gave an interview to the agent. Viner stated that he knew there was cocaine in the car and that he and Harris were taking the vehicle to Lubbock. Viner understood that Harris intended to pay him half of what Harris was paid. Viner stated that he was driving the car because Harris' license was suspended. Viner explained that he and Harris had picked up the car in El Paso and had taken it to the Mall in El Paso where a Hispanic man took it for about one hour. Viner also stated he was willing to deliver the car to Lubbock and to fully cooperate with the United States. Viner told the agent that he was attempting to smuggle the cocaine because he did not have any money and this was an easy way to make money. He also said that he had never attempted to smuggle drugs before. [Investigative report, pp. 41-42.]

6. On June 23, 2001, Harris and Viner were charged by complaint with possession of more than 20 kilograms of cocaine and conspiracy to possess and distribute it. [Doc. No 1, No. Cr. 01-1312.] Viner was appointed counsel, Carmen Garza in June 2001. In September 2001, Ms. Garza moved to withdraw due to an irreconcilable conflict of interest. [Doc. No. 14, No. Cr. 01-1312.] Her motion was granted. Viner's second attorney was Herman Ortiz, about whom Viner complained in correspondence to the Court, dated October 10, 2001. [Doc. No. 21.] Ortiz was allowed to withdraw, and in late October 2001, the Court appointed Peter Giovannini as Viner's third attorney. On December 5, 2001, both Harris and Viner were scheduled for a plea hearing (apparently having been offered a joint plea agreement), but Viner elected instead to go to trial. [Doc. No. 29.] Harris still wished to plead guilty, although the joint plea agreement was no longer extended to him. [Doc. No. 30.] A trial was scheduled and Harris was listed as a government witness against Viner. On February 8, 2002, Attorney Giovannini moved to withdraw as counsel based on Viner's discontent

4

with him. [Doc. No. 45.] The motion was initially denied. Giovannini filed several pretrial motions on behalf of Viner. On May 14, 2002, after a number of continuances as to the trial and after Viner alleged misconduct by Giovannini to the State Disciplinary Board, the Court permitted Giovanni to withdraw as counsel and appointed Marc Robert as Viner's fourth attorney. [Doc. No. 80, 81.] A trial was rescheduled for September 9, 2002; however, prior to trial, Viner agreed to enter into a plea. [Doc. No. 87.]

      7.      On August 21, 2002, Viner appeared with Attorney Robert at the plea hearing before the Honorable James A. Parker. Viner testified that he had a high school education, that he was able to understand the proceedings that day, that he understood the conspiracy charges against him, and that he intended to plead guilty to the conspiracy charge (Count I: Conspiracy to Possess 5 kilograms or more of Cocaine with Intent to Distribute). [Plea Hearing Transcript, pp. 3-4.] He was fully satisfied with Attorney Robert and had read, understood and signed the Plea Agreement. [Doc. No. 89.] Viner testified that he understood that he could proceed to trial and that he was not being forced to plead guilty. [Id., p. 7.] Viner understood that the maximum period of imprisonment for the offense was life imprisonment and that the mandatory minimum sentence was 10 years. [Id., p. 8.] The court reviewed the parties' stipulations in the Plea Agreement including a non-binding stipulation that Viner was entitled to a reduction of three levels from the base offense level for acceptance of personal responsibility and a non-binding stipulation that Viner was entitled to a reduction of four additional offense levels because he was a minimal participant. [Id., p. 9.] Viner knew that he was stipulating to a mandatory minimum sentence of 10 years. [Id., p. 10.] The government explained that this was not a Rule 11(e)(1)(C) because Viner was not safety valve eligible. The calculation of Viner's guideline level was going to fall below the mandatory minimum sentence of 120 months (10

years); therefore, the mandatory statutory sentence of 120 months would become the guideline sentence. [Id.] Viner understood that he waived his right to appeal except to the extent that the Court might depart upward from the guideline sentencing range. [Id., p. 11.] Viner further testified that he had not been coerced into pleading guilty. Moreover, he and his attorney had discussed the sentencing guideline. The Court further explained to Viner that Viner's attorney believed that the guideline range would be below the mandatory minimum sentence of 10 years with the result that the guideline sentence of 10 years would be Viner's sentence. [Id., p. 12.] Viner had no questions regarding the sentence guideline and he testified that he understood fully the consequences of pleading guilty. [Id., p. 13.]

      8.    At the plea hearing, counsel for the government summarized the evidence it would prove at trial, including the fact that Viner had admitted to knowing the cocaine was in the car. [Id., pp.13-14.] Viner testified that he agreed that the government could prove this evidence at a trial. Attorney Robert stated that he believed it was in Viner's best interest to plead guilty. However, the Court asked for a more thorough explanation of why it was in Viner's best interest because of the long sentence. [Id., p. 14.] Robert explained that the risk of exposure to sentence over the 10 year mandatory minimum was virtually eliminated by the government's agreement that Viner was a minimal participant who accepted responsibility. Robert also stated that he had discussed the possibility of a § 5K1.1 but that after extensive discussions with Viner and the government, he believed it was not an option. Viner was asked for his plea, and he pled guilty. [Id., p. 15.]

      9.    On September 25, 2002, the Court held a status conference in this matter concerning Viner's confusion regarding the possibility of the government entering into a cooperation agreement with him. Attorney Robert believed that they had exhausted the possibilities of entering into a

cooperation agreement but that Viner did not appear to understand the limits the Court was under with respect to granting a downward departure below the minimum mandatory 10 year sentence. [Transcript of 9/25/02 Status Conference, pp. 3-4.] Robert explained that he understood the Court could not depart beneath the 10 year mandatory minimum unless the government moved for a § 5K downward departure. Viner then stated that he had information about a terrorist organization that he felt he needed to bring to the Court's attention. However, Robert explained that the information Viner had offered regarding this organization did not appear to be from independent knowledge and instead came from another person who had been prosecuted in a different case. [Id., p. 6.] The prosecutor explained that not even the other individual, who may have had first hand knowledge about this organization, had received a sentencing benefit from this information. Viner then asked the prosecutor why he had not received credit for having been willing to deliver the car for the drug drop off in his case. Robert explained to the Court that while both Harris and Viner had been willing to participate in a controlled delivery of the 22 kilos of cocaine, the government determined that it was unable to obtain clearance to make the delivery at the time it needed to be done. [Id., pp. 7-8.] The prosecutor explained that Harris did not receive a § 5K motion on that basis either, since no controlled delivery was made. Viner asked why Harris received a benefit under a § 5K motion, and the government explained that Harris may benefit from such a motion because of his early willingness to testify against Viner had Viner proceeded to trial. [Id., p. 9.] Viner was concerned that Harris was getting a benefit for doing something Viner also was willing to do with respect to the controlled delivery. The Court, however, explained the difference was that Harris apparently agreed to testify against Viner. Viner stated that he was caught in a situation where Harris had all of the details of the operation whereas Viner did not since he was a less significant player. The prosecutor explained that

7

Harris had been cooperative all along whereas as Viner had backed out of the first plea agreement that was offered to him. The Court stated to Viner that it could not depart downward without a motion filed by the government under § 5K1.1. There also was no way to apply a safety valve in this case because Viner had a prior conviction in Texas, was on probation for that conviction when this incident occurred, and had more than one criminal history point. [Id., p. 15.] Viner asked the Court what other options it had to depart downward under the guidelines, and the Court discussed departures under § 5K2.0 when there are aggravating or mitigating circumstances established. Robert explained that only with a §5K1.1 motion was there the potential of breaking below the 10 year mandatory minimum.

10.     After this rather extensive discussion, the Court asked Viner if he wished to withdraw his plea and proceed to trial. [Id., pp. 18-19.] Viner stated that he would "go ahead and stick with my plea agreement." [Id., p. 19.] He believed it to be the best option he had after looking at the evidence and because the government "ain't one to budge." Viner then raised the issue of the lab report to the court, stating that it did not make sense to him and that his attorney was unable to explain it to him. Robert explained that the problem was one of interpretation of the lab report. Robert was not concerned about the issue raised by Viner because the quantity cut-off for the 10-year minimum mandatory was five kilos,[3] and the amount seized was well over that. The Court asked Viner if after Robert's explanation to him regarding the report Viner now understood that even if the lab report were interpreted in the way most favorable to him, the quantity still remained in excess of

---

[3] One kilogram is approximately 2.2 pounds; thus, five kilos is approximately 11 pounds. Here, over 50 pounds were seized.

8

the amount that was required to support the minimum mandatory sentence of 10 years. Viner stated that he understood. [Id., p. 23.]

11. On November 5, 2002, Viner was sentenced before Judge Parker. [Transcript of Nov. 5, 2002 Sentencing Proceeding.] Viner was represented by a fourth attorney, Martin Lopez III, because Attorney Robert had accepted a job with the Federal Public Defendant's office in Las Cruces and that office had represented Harris. Viner testified that he had read his PSR and had discussed it with counsel. No objections to the PSR were filed. Viner further testified that all the statements of fact in the PSR were correct. [Nov. 5, 2002 Sentencing Transcript, p. 2.] The Court accepted Viner's guilty plea, noting that the PSR indicated a total offense level of 27, a criminal history category of 3, and a guideline imprisonment range of 87 to 108 months. However, because of the statutory mandatory minimum, Viner would be imprisoned for a period of 10 years. In his statement to the Court, Viner apologized and explained that he had made a mistake. [Id., p. 5.] Judge Parker told Viner that he found it very difficult to impose the sentence that he had to impose. Viner further stated that he was glad this had happened since his prior life outside of prison was in danger due to his use of cocaine. [Id., p. 6.]

12. Judgment against Viner was entered on November 12, 2002. Viner did not take a direct appeal. Harris was later sentenced and received a term of incarceration of 18 months. There is a letter to the Court from Viner's fourth attorney, Mr. Lopez, dated July 11, 2003. In a letter, dated July 11, 2003 from Viner's fourth attorney, Lopez states that Viner had submitted correspondence that Lopez refused to appeal his sentence and that Viner had requested a new attorney. According to Lopez's letter, Viner had not requested that an appeal be made and Lopez had not rejected a request to appeal Viner's sentence. Lopez requested that the Court appoint

another attorney for Viner to investigate and negotiate with the government regarding a possible cooperation agreement to reduce Viner's sentence. Viner also submitted a letter to the Court, dated July 22, 2003, in which he states that Lopez had mistakenly said Viner was asking to file an appeal. "I not file appeal, I am filing a DOWNWARD DEPARTURE." Viner requested appointment of another attorney in the criminal proceeding. However, the criminal proceeding was completed. Viner filed this § 2255 petition on September 11, 2003.

## Analysis

### A. Failure to Appeal

13. Viner did not appeal, and a defendant who fails to attack his sentence on direct appeal is generally barred from raising the issue in a § 2255 proceeding, unless he can show cause and prejudice or a fundamental miscarriage of justice. United States v. Allen, 16 F.3d 377, 378 (10th Cir. (1994) (*citing* United States v. Frady, 456 U.S. 152 (1982)). However, the government seems to raise the issue of procural default as to only one of Viner's claims. *See* Doc. No. 13, pp. 6-7. Although the habeas court may raise the issue *sua sponte*, Hines v. United States, 971 F.2d 506, 509 (10th Cir. 1992), it need not do so and may proceed to the merits, if a procedural disposition does not serve the interests of judicial efficiency and orderly and prompt administration of justice. Allen, 16 F.3d at 379.

14. The Court will proceed to analyze Viner's claims in spite of his default, because Viner might be able to establish cause for failing to appeal, due to his waiver of appellate rights,[4] and because the parties have already expended considerable resources in litigating the merits. In addition,

---

[4]The Court does not reach this issue.

Viner's ineffective assistance of counsel claim(s) are more appropriately brought in a habeas proceeding than on direct appeal. United States v. Kay, 961 F.2d 1505, 1508 (10th Cir. 1992).

### B. Cognizability of Certain Claims

15. The Court finds certain of Viner's claims are not cognizable for a different reason. A defendant who voluntarily and intelligently pleads guilty waives all non-jurisdictional defenses, and "[h]aving pleaded guilty, a defendant's only avenue for challenging his conviction is to claim that he did not voluntarily or intelligently enter his plea." United States v. Wright, 43 F.3d 491, 494 (10th Cir. 1994); United States v. Salazar, 323 F.3d 852, 856 (10th Cir. 2003). "It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984). Thus, the movant is barred from raising claims other than those which go to the knowing and voluntary nature of his plea. Wright, 43 F.3d at 494.

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

United States v. Davis, 900 F.2d 1524, 1526 (10th Cir.) (*quoting* Tollett v. Henderson, 411 U.S. 258, 267 (1973), *cert. denied*, 498 U.S. 856 (1990).

16. Here, the underlying criminal record, including hearing transcripts, demonstrate that Viner entered a voluntary and intelligent plea of guilty. He testified that he understood the plea

11

agreement and terms of that agreement and further, that he was not coerced into pleading guilty. Indeed, during a status conference subsequent to his plea hearing but prior to sentencing, additional lengthy explanations were provided to Viner by the Court and counsel as to what sentence he could expect to receive based on his guilty plea, his criminal history, and the government's position as to Viner's attempt to cooperate. In addition, the Court inquired into whether Viner wished to withdraw his plea at the status conference, and Viner unequivocally stated that he would remain with the plea of guilty rather than take his chances at a trial and receive a longer sentence.

17. Nowhere in Viner's many habeas pleadings does he challenge the voluntary and intelligent character of his guilty plea. For example, he does not now allege that he was threatened or coerced into pleading guilty at any time. Indeed, he initially admitted to authorities that he knew he was driving a vehicle with cocaine and that he expected to be paid for the delivery of the cocaine. At his plea hearing, Viner solemnly admitted in open court that he was guilty of the offense with which he was charged. He admitted to the Court during his sentencing that he had made a mistake, also indicating acceptance of his guilt.

18. Viner's claims concerning the alleged defective, deficient or inadequate laboratory testing of the cocaine are not the types of claims that challenge the voluntary and intelligent nature of his guilty plea. This is partly true because Viner had the lab report well before he entered his plea of guilty. Moreover, during the status conference, Viner raised his concerns about the lab report and his questions about the quantity of cocaine for which he was being charged. After further explanations by his attorney, Viner testified that he understood that even if the lab report were interpreted in the way most favorable to him, the quantity of cocaine still remained in excess of the amount that was required to support the minimum mandatory sentence of 10 years. Thus, the Court

concludes that none of Viner's claims about the lab report or laboratory testing of the cocaine are viable bases to challenge the voluntary and intelligent nature of his guilty plea.

19.  In addition, the Court agrees with the government in that even if it were to examine the merits of Viner's claims regarding the lab reports, those claims would fail. Viner is mistaken that he received enhanced sentencing penalties related to conspiring to possess "crack" cocaine rather than powder cocaine. In addition, Viner's arguments regarding the purity and composition of the drug found in the vehicle are misplaced. Viner was sentenced for conspiring to possess "a mixture or substance containing a detectable amount of Cocaine," under 21 U.S.C. § 841(a)(1). The purity of the cocaine is not at issue as long as there was a detectable amount, which testing established there was. Finally, Viner's lab report arguments are irrelevant because he plead guilty to ***conspiring*** to possess cocaine. Possession of actual cocaine is not an element of the crime of conspiracy. Thus, Viner could have been convicted of conspiracy even if the substance he was carrying had turned out to be powdered sugar.

20.  Viner's claim regarding the calculation of his criminal history points also does not constitute a proper collateral attack of his sentence. He states that there was an "initial error" in his PSR and yet he filed no objections to the PSR. It is difficult to ascertain to which exact error Viner alludes. Viner testified during his sentencing that he read his PSR, discussed it with his counsel and admitted that there were no factual errors in the PSR. However, now he asserts that he was given 6 points when he should have been given 5 points relating to prior conviction occurring in June 2002, or that he was assigned a criminal category of 8 instead of 5.[5]  [Doc. No. 1, p. 25.]

---

[5] What criminal history points or category Viner believes he was entitled to is not entirely clear from his pleadings.

13

21. The use of prior convictions to enhance a defendant's base offense level and criminal history category under the sentencing guidelines in itself does not violate the Constitution. With the sole exception of convictions obtained in violation of the right to counsel, a defendant in a federal sentencing proceeding has no right to collaterally attack the validity of previous convictions used to enhance his sentence. *See* United States v. Simpson, 94 F.3d 1373, 1382-83 (10th Cir.), *cert. denied*, 519 U.S. 975 (1996). Here, Viner does not claim that a prior conviction was obtained in violation of the right to counsel. Thus, the Court does not find his challenge to be a cognizable collateral attack of his sentence.

22. Viner may claim that there was some type of clerical error in the PSR, to which he did not object initially. A defendant is entitled to relief under § 2255 only where the error "qualifies as 'fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure.'" Knox v. Wyoming Dep't of Corrections State Penitentiary, 34 F.3d 964, 968 (10th Cir. 1994) (internal quotation omitted), *cert. denied,* 513 U.S. 1091 (1995). Even if the Court could find an error in Viner's PSR, a determination it is unable to make based on Viner's allegations, there does not appear to be a "fundamental defect" that inherently resulted in a complete miscarriage of justice. This is particularly true here where the government points out that even if Viner should have received five instead of six criminal history points, his mandatory minimum sentence of 10 years would not have been altered. Thus, the court concludes that Viner's claim concerning alleged errors in the PSR fails to raise a cognizable challenge.

C. **Ineffective Assistance of Counsel**

23. Notwithstanding the many pleadings, affidavits and other documents submitted by Viner, his arguments regarding ineffective assistance of counsel are sparse and non-specific. Even

after liberally construing these *pro se* pleadings as it must, Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991), the Court has difficulty identifying any specific support for Viner's claim of ineffective assistance of counsel or against which of his five attorneys he directs any particular complaint. Viner contends generally that all of his attorneys were ineffective "in all of the stages of trial proceedings" and that purportedly one attorney's actions caused "a chain reaction of ineffectiveness." [Doc. No. 1, p. 8.] As best as the Court can determine from Viner's voluminous and confusing pleadings, he claims that counsel should have challenged the previously discussed lab report, should have investigated the underlying facts more thoroughly (although Viner never identifies what investigation should have been performed and/or what was not done), should have objected to the PSR, should have shown more interest in Viner's case, were too interested in encouraging Viner to accept a plea agreement, and should have filed a direct appeal. [Doc. No. 1.]

24.     It is true that the two-part test of Strickland v. Washington, 466 U.S. 668 (1984), applies to challenges to guilty pleas based on a claim of ineffective assistance of counsel. Hill v. Lockhart, 474 U.S. 52, 58 (1985). Under Strickland, Viner must show that his attorney's performance was deficient and that he was prejudiced by this poor performance in that there is a reasonable probability that, but for the errors, he would not have pled guilty and would instead have insisted on going to trial. Hill, 474 U.S. at 59. "A defendant making an ineffective claim on a counseled guilty plea must identify particular acts and omissions of counsel tending to prove that counsel's advice was not within the wide range of professional competence." Moore v. United States, 950 F.2d 656, 660 (10th Cir. 1991).

25.     Here, Viner fails to identify any particular acts or omissions of any of his five attorneys that tend to prove his attorney's advice was not within the wide range of professional competence.

15

He simply has not demonstrated that any attorney's performance was deficient or that he was prejudiced by his attorneys' alleged poor performance. Not only does he fail to identify any errors by his attorneys, he never claims that he would have insisted on going to trial had his attorney(s) advised him differently at any particular stage of the proceeding. The Court has already discussed the lack of merit of Viner's allegations regarding the lab report and the criminal history contained in the PSR. Thus, counsel's failure to raise these issues did not prejudice Viner. Moreover, Viner himself raised the issue of the lab report before the Court and after an extensive discussion understood that the lab report results had not affected his possible sentence. Moreover, after this discussion, Viner clearly and unequivocally decided not to withdraw his plea of guilty. He further explained to the Court that he did not believe he would be successful if he were to proceed to trial. Indeed, he believed the Court would sentence him to time that would exceed the mandatory minimum of 10 years. Viner does not satisfy the requirements of Strickland, and therefore, his ineffective assistance of counsel claims fail.

26.   The same is true with respect to his ineffective assistance of counsel claim that is based on his attorney's failure to file an appeal. An ineffective assistance of counsel claim, based on counsel's failure to file a notice of appeal, must also be judged in accordance with Strickland v. Washington, 466 U.S. at 687-88, 694. Thus, Viner must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the petitioner was prejudiced by counsel's deficient performance. Roe v. Flores-Ortega, 528 U.S. 470, 476-77, 120 S.Ct. 1029 (2000); United States v. Crowell, 15 Fed. Appx. 709, 712, 2001 WL 845242 at *2 (10th Cir. July 26, 2001).

27.   An attorney who disregards "specific instructions" from a defendant to file a notice of appeal acts in a manner that is professionally unreasonable. Roe, 528 U.S. at 477. Under those

16

circumstances, the client need not demonstrate that his appeal would likely have had merit. Id. When a client does not specifically instruct his attorney to appeal, the question of whether counsel was ineffective depends on whether he or she consulted with the client about the appeal. Id. at 478.

28.  An attorney need not always consult with a defendant regarding an appeal. "[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal where there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Id. at 480.

29.  The second part of Strickland requires a showing of prejudice from counsel's deficient performance. The failure to follow specific instructions from a defendant who requests that the attorney file an appeal amounts to a denial to counsel at a critical stage or to being deprived of the appellate proceeding altogether. "Under such circumstances, '[n]o specific showing of prejudice [is] required,' because 'the adversary process itself' is presumptively unreliable." Id. at 483 (internal citations omitted). "[W]hen counsel's constitutionally deficient performance deprives a defendant of an appeal that he would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal." Id. at 484.

30.  If a petitioner has successfully shown that the was denied the right to direct appeal, the proper remedy is to vacate the sentence and remand for re-sentencing. Rodriguez v. United States, 395 U.S. 327, 332, 89 S.Ct. 1715 (1969). Here, Viner never asserts that he instructed his attorney to appeal. Indeed, in some of the correspondence discussed *supra*, Viner indicated that he did not instruct his attorney to appeal. Moreover, Viner has not presented any nonfrivolous bases for an appeal that his attorney should have considered, nor shown that a rational defendant would

have wanted to appeal under the circumstances of Viner's plea and conviction. Therefore, the ineffective assistance of counsel claim, based on his attorney's fail to file an appeal, must also fail.

### D. General Claim of Unfairness or Innocence

31.     Many of Viner's pleadings request what he characterizes as a "Short-N-Speedy Rehearing Trial" so that he can present evidence of his apparent innocence. [*See, e.g.,* Doc. Nos. 6, 18.] Viner claims that he was an 18 year old kid controlled by his co-conspirator Harris as to what to say and do on the date in question, and that he was scared and threatened by Harris. [Doc. No. 18.] Viner argues in another pleading that he will be set free once Harris tells the whole truth. [Doc. No. 17.] Harris provided an affidavit on Viner's behalf, subsequent to Harris receiving his sentence of 18 months, stating that Harris was scared to open his mouth and tell the truth about Viner's lack of involvement for fear of receiving a longer sentence. According to Harris, he kept Viner in the dark and used Viner "like a toy" because of his age. Harris described Viner as the "deliver fool," who did not have knowledge of the job. [Doc. No. 1, unnumbered 2-page affidavit, attached as exhibit; Doc. No. 19.] Similarly, Viner wishes Larry Profit to testify on his behalf. Profit submitted a number of affidavits in this case stating that Harris told Profit that Viner essentially is innocent, had nothing to do with the conspiracy and is doing time that Viner should not be doing. [Doc. No. 14, 16.]

32.     In a sense, Viner argues that his 10-year sentence of incarceration, in contrast to Harris' 1½ year sentence of incarceration (notwithstanding Harris' apparent larger role in the cocaine delivery and plan) is unfair. This Court, like the sentencing Court, is sympathetic to Viner's plight and the obvious sentencing disparities. However, the disparity in sentences can be attributed to Viner's decision to reject the joint plea offer initially made to him and Harris and his decision to go to trial. [Doc. No. 29.] While Viner ultimately pled, it was not to the original plea proposal. A

second aspect of the harsher sentence has to do with Viner's criminal history category which compelled a lengthier sentence. Moreover, Viner supplies no basis for a "rehearing" or for a claim of actual innocence. Indeed, Viner initially admitted knowing that there was cocaine in the vehicle he was driving. He expected to be paid for delivering the cocaine. While he may not have known the details of the operation, he still knowingly participated in criminal activity. Even in his habeas pleadings, Viner still admits that he was motivated by the money to participate in this illegal operation.

33. Viner acted with Harris. At his plea hearing, Viner testified that he understood the charge of conspiracy against him in which he and Harris conspired with each other. [Transcript of Plea Hearing, p. 4.] Based on this admission and his plea, Viner became responsible for all of the acts of the other members in furtherance of the conspiracy. "Acts attributable to any member of the conspiracy are attributable to all other members." United States v. Mendoza-Salgado, 964 F.2d 993, 1006 (10th Cir. 1992). Even if a defendant does not have knowledge of all the details, or even all the members of the conspiracy, and may have played only a minor role, he will nevertheless be liable for all reasonably foreseeable acts of his co-conspirators in furtherance of the conspiracy. Id., at 1005; United States v. Brewer, 983 F.2d 181 (10th Cir.), cert. denied, 508 U.S. 913 (1993). Thus, while the sentencing disparities are regrettable, the Court finds no basis for a rehearing on Viner's claim of actual innocence.

### E. Evidentiary Hearing

34. Title 28 U.S.C. § 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law. . . ."

19

Unsupported generalizations, however, are insufficient to warrant a hearing on a § 2255 motion. Eskridge v. United States, 443 F.2d 440, 443 (10th Cir. 1971). Allegations must be "highly specific" or accompanied by some "independent corroboration" before a hearing is required. *See* Siciliano v. Vose, 834 F.2d 29, 31 (1st Cir. 1987). Moreover, with respect to this civil action, the petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to relief. Strickland v. Washington, 466 U.S. 668. Here, the Court concludes that Viner did not satisfy his burden of establishing an entitlement to a § 2255 evidentiary hearing.

## Recommended Disposition

35.     That Viner's Motion for Hearing [Doc. No. 23] be denied, that his § 2255 petition [doc. 1] be denied, and that this matter be dismissed, with prejudice.

*[signature]*
Lorenzo F. Garcia
Chief United States Magistrate Judge